**John Henry DAVIS et al.**

**v.**

**William P. ROBINSON, Jr., Individually and as Director of the Rhode Island State Agency for Elementary and Secondary Education, Maureen O'Connell, individually and as Coordinator of School Food Services for the R.I. State Agency for Elementary and Secondary Education.**

**Civ. A. No. 4488.**

United States District Court,
D. Rhode Island.

Aug. 2, 1972.

Jay C. Lipner, Joseph F. Dugan, Peter W. Thoms, Rhode Island Legal Services, Inc., Providence, R. I., Stephen R. Elias, New York City, for plaintiffs.

Richard J. Israel, Atty. Gen., W. Slater Allen, Jr., Asst. Atty. Gen., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

Claiming that needy school children have a constitutional and statutory right to receive free or reduced price school lunches, plaintiffs bring this civil rights action. The action is brought on behalf of the class of impoverished school children within the State who are not provided with free or reduced price school lunches, and it has been certified as a class action.

Jurisdiction is asserted on 28 U.S.C. § 1331, § 1337, § 1343, § 2201 and § 2202. Plaintiffs seek a declaration that the refusal by defendants to establish National School Lunch Programs (NSLP's) in the neediest schools first, and provide free lunches to the neediest children first, is violative of the National School Lunch Act, (NSLA), 42 U.S.C. §§ 1757, 1758 and 1759a, and the regulations promulgated thereunder, 7 C.F.R. § 245.4. They also seek a declaration that the "arbitrary" refusal to provide such lunches in some schools, while providing them in other schools violates the Fourteenth Amendment's guarantee of equal protection of the law. They ask a permanent injunction prohibiting defendants from refusing to provide free lunches to children attending Rhode Island schools who qualify for free lunches under defendants' own free lunch criteria. They also ask a permanent injunction prohibiting defendants from refusing to establish School Lunch Programs and provide free lunches on a priority of need. Finally, they seek their costs and such further relief as the Court may deem appropriate.

Plaintiffs argue, *inter alia*, that as a condition for receiving federal funds under the National School Lunch Act, 42 U.S.C.A. § 1751 et seq., the entity responsible for implementation of the school lunch program within a state must assure that all poor children under its jurisdiction receive a free or reduced price lunch, 42 U.S.C.A. § 1758, 7 C.F.R. § 245.3. They assert that in Rhode Island, unlike most other states, a state agency, the Rhode Island State Agency for Elementary and Secondary Education, is the entity responsible for directly operating about 80% of all school lunch programs in the state. It is alleged that in their respective capacities, defendants Robinson and O'Connell have supervisory powers and direct control over the establishment, administration and operation

of the Federal school lunch program in numerous schools throughout the state of Rhode Island.

Plaintiffs claim two statutory and regulatory violations by defendants. First, they assert defendants have failed to follow the priority of need in establishing school lunch programs and providing free lunches. Second, they argue that defendants have failed to provide free lunches to members of the plaintiff class who meet the eligibility requirements for a free lunch.

They argue that defendants have violated the Constitution by conditioning the provision of free lunches on the basis of the school attended or the district in which the school is located. They argue that poor nutrition adversely affects a school child's education, that the right to equal educational opportunity is a fundamental interest, and that defendants have not shown a compelling state interest justifying this infringement on poor school children's education. Alternatively, they argue that new procedures for providing school lunches have minimized the expenditures of local school authorities who participate in the program, so that there is no rational basis for defendants' failure to provide school lunches to all needy school children.

This court has jurisdiction pursuant to 28 U.S.C. § 1343(3) to hear the claim of denial of equal protection. Ayala v. District 60 School Board of Pueblo, Colorado, 327 F.Supp. 980, 981 (D.Colo. 1971). The claims of violation of the statutes are pendant to the constitutional claim and within this Court's jurisdiction. Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

Defendants do not, for the most part, dispute plaintiffs' contention that needy children are not receiving state lunches. Rather, they argue that they do not have the authority ascribed to them by plaintiffs and that "in the first instance the school committees have the ultimate power to afford or withhold lunches." Relying upon Briggs v. Kerrigan, 431 F.2d 967 (1st Cir. 1970) they urge on behalf of the school committees that lack of facilities is sufficient justification for a failure to provide lunch and that school committees can appropriate moneys for other school purposes without violating federal law. Plaintiffs respond that state officials do control the school lunch program and that, due to satellite feeding and catering programs, lack of facilities cannot be a justification for failure to provide a lunch.

Defendants have moved for summary judgment and have moved to dismiss for failure to join as indispensible parties the members of local school committees. The motions are denied for reasons which will appear in the Court's discussion of the case infra.

Named plaintiffs all have incomes below the poverty levels set by the state, making such families eligible for free or reduced price benefits under the NSLA. These lunches are not available to children in the plaintiff families, because they attend schools without a school lunch program.

*National School Lunch Program*

For the purposes of this opinion only a summary description of the National School Lunch Program will be given. A careful and more thorough description may be found in Briggs v. Kerrigan, 307 F.Supp. 295 (D.Mass.1969).

Under the National School Lunch Act, 42 U.S.C.A. § 1751, federal financial assistance is offered to the states to help defray the costs of serving lunches to school children, with general cash assistance paid for each meal served, special cash assistance paid for meals served free or at a reduced price, non-food assistance paid to meet the costs of equipment, and surplus commodities made available without charge.

Each federal dollar expended in the program must be matched by three state dollars. Federal funds are not available for expenses attributable to construction of or alteration of buildings or land acquisition. States who wish to participate in the program enter into written agreements with the United States Department of Agriculture (USDA). Through

measurement of an "assistance need rate," the matching requirement for poorer states is reduced. Thus poorer states receive greater proportional assistance than wealthier states.

Under 42 U.S.C.A. § 1757 need and attendance must be taken into account in disbursing of funds by state officials to individual schools.

*Rhode Island School Lunch Programs*

Any doubt that the state agency directs and controls school lunch programs in Rhode Island was removed by the action of the Rhode Island legislature, subsequent to the commencement of this lawsuit, amending R.I.G.L. 16–8–10 and making the school lunch program largely mandatory in schools throughout the state.[1]

In Rhode Island either the state itself or the local school committee may operate the National School Lunch Program. The parties have stipulated that the School Lunch Division of the Department of Education directly employs and pays at least 904 persons, including 21 administrative personnel and 883 cooks and cook's helpers. The administrative arm of the School Lunch Division has direct responsibility and control of the hiring of personnel, buying, storage, processing, transportation, preparation and serving of food to school children in state operated programs. The School Lunch Division prepares the menu for all schools in the state operated programs, provides continuing nutritional and supervisory instruction to all persons working for the state operated programs, and conducts audits, surveys, and administrative reviews of program operations. The Coordinator of School Food Services, defendant O'Connell has direct administrative control over the Local School Directors of the state operated programs, even though such directors are not state employees.

The School Lunch Division retains control over all federal funds allocated to Rhode Island for state operated programs. No federal funds are actually disbursed to the schools. Rather, the federal funds received by the state are accounted for by a method based on the total number of lunches served as reported to the state agency by the participating schools. No individual balance sheets are kept for each school.

Checks received from student payments are transferred to the state treasury and credited to the school lunch account. Transportation companies bill the School Lunch Division directly. Other state agencies are directly responsible for parts of the state program, e. g. the Department of Administration buys the food. The School Lunch Division pre-

<hr>

[1] "It is enacted by the General Assembly as follows:

SECTION 1. Section 1. Section 16–8–10 of the General Laws in Chapter 16–8, entitled "Federal Aid" is hereby amended to read as follows:

16–8–10. *Mandatory school lunch programs.* Commencing September 1, 1972 or commencing September 1, 1973 for any city or town whose fiscal year began prior to March 1, 1972, those schools identified by school boards to the department of education as needy schools for Title I ESEA purposes, and commencing September 1, 1973 all public elementary and secondary schools, shall be required to make Type A lunches available to students attending those schools in accordance with such rules and regulations as are adopted from time to time by the department of education. To the extent that federal, state and other funds are available, free and reduced priced Type A lunches shall be provided to all students from families which meet the current specific criteria established by federal and state regulations. The requirement that Type A lunches be provided shall apply to locally managed school lunch programs, and school lunch programs administered directly by the department of education or by any other public agency whether using school facilities or a commercial catering service. The department of education is further authorized to expand the school lunch program to the extent that federal, state and/or local funds are available by the utilization of one or more food preparation centers for delivery to participating schools for the purpose of providing meals to students on a more economical basis than could be provided by a community acting individually.

SEC. 2. This act shall take effect upon passage."

pares and publishes, after hearings, Regulations and Guidelines for Free and Reduced Price Lunches, which are mandatory for all school lunch programs. Rhode Island, other than Hawaii and American Samoa, is unique in its direct operation of school lunch programs.

While the parties have stipulated to statistics concerning school lunch programs within the state since 1969, for purposes of this opinion the Court will focus upon the past year. During fiscal 1971 the total number of school lunches served in Rhode Island was 8,639,262, of which 2,635,126 were free or at a reduced price, and 6,004,136 were paid. During this period, the state operated school lunch programs served 6,734,141 lunches, of which 2,463,029 were free or at a reduced price, and 4,271,112 were paid. Thus during fiscal 1971, state operated programs accounted for 78% of the total number of lunches served, 93% of the free or reduced price lunches, and 71% of the paid lunches served.

As of November, 1971, there were 503 schools in Rhode Island, of which 373 were public and 130 were private. Of these 503 schools, 31 were private schools with independent feeding programs not connected with the N.S.L.P. Of the remaining 472 schools, 269, or 57%, had school lunch programs. Of the 269 schools with school lunch programs, 219 were state operated programs. Of the 219 state operated programs, 209 were public schools with 111,902 children and 10 were private schools with 3,444 children. The remaining 50 programs of the 269 were locally operated programs.

Excluding the 31 private schools with independent feeding programs, 203 schools, or 43% of the schools in Rhode Island, were without a school lunch program. Of these 203 schools, 127 were public schools, that is, 34% of the public schools in the state did not have school lunch programs. These 127 schools enrolled approximately 43,800 students.

As of November 4, 1971, the Department of Education, in a submission to the Board of Regents, stated that there were 56 Title I needy schools, enrolling 21,175 children, without school lunch programs. During 1970–71, 33 schools were added to the school lunch program, of which 17, or 52%, were Title I schools. Of these 17, 15 were state operated programs and 2 were locally operated programs.

During fiscal 1971–72, 25 schools have been added to the school lunch program, 18 with state operated programs and 7 with locally operated programs. None of the 7 locally operated programs are Title I schools; 4 of the 18 state operated programs are Title I schools. Of the school lunch programs added this year, 16% are Title I schools.

For purposes of defining which schools are needy, the Department of Education uses Title I as a guide. According to the State Plan of Nutrition Operations for fiscal 1972, there were, as of June 25, 1971, 74 schools in Rhode Island without a food service and classified as needy. While this plan indicates that emphasis will be placed on extending the school lunch program to the neediest schools first, it is also true that defendants have never refused to establish a school lunch program whenever asked to do so, even if the requesting school is wealthier than other schools without lunch programs in the school district. The School Lunch Division does not always know whether superintendents and school committees consider relative poverty data in their decisions to expand the school lunch program. No statistical or cost analysis of alternate feeding methods has been made since 1969. There have been no feasibility studies relating to the establishment of a state kitchen for state operated programs. However, the parties have stipulated that defendants do not raise, by way of defense, limited financial resources as a reason for not expanding the school lunch program, and that needy schools may acquire almost all of their required equipment to establish a school lunch program without cost to themselves. State funds may be used for school lunch programs by local school districts.

As testimony from various local school district officials establishes, it is not uncommon for a National School Lunch Program to be established in relatively wealthy schools within a given district while Title I schools in the same district go without lunch programs. The most commonly given reasons for this were lack of facilities such as lunchrooms and kitchens. Some districts had considered and rejected satellite feeding programs or installation of kitchens as too costly. It appears that while few studies have been done and little consideration given to providing lunches through a cold lunch catering program or bag lunch program, some local school officials expressed views on the problems of such a program. The foremost objection was that even a catered cold lunch program would require supervision. This supervision would entail some cost and perhaps, in Coventry, if teachers were required to supervise, renegotiation of contracts with teachers' unions. It is unclear whether the state would provide teachers aides to supervise such a program. In schools where classrooms are used as lunchrooms, the superintendent of Cranston schools expressed concern over the "health environment"—that is, the spillage of food and keeping youngsters in the room all day. One school district, Central Falls, has no lunch program in any school but sends its children home for lunch.

The statistics establish that defendants do in fact operate the great majority of school lunch programs in Rhode Island. Since May, 1970, they have not expanded the school lunch program to the neediest schools first, but have allowed expansion without regard to need. Defendants are willing to establish and operate a school lunch program in any school which requests one. There are substantial numbers of needy children in the state who attend schools without lunch programs.

### Effects of NSLP on Schoolchildren

Primarily through two expert witnesses plaintiffs have attempted to demonstrate the effect not having lunch has on the education of poverty-level students. Dr. Jean Mayer [2] testified that families which meet the Income Poverty Guidelines for free and reduced price lunches have a high proportion of their members who do not meet recommended dietary standards. A much higher proportion of poor children than of wealthier children suffer from various nutritional deficiencies related to conditions such as anemia and susceptability to illness. In the opinion of Dr. Mayer, Rhode Island families who meet the income poverty guidelines for free or reduced price school lunches run a high risk of not obtaining an adequate diet. Children of such families are more likely to have an inadequate diet than children of higher income families.

A child from a low-income family in Rhode Island or elsewhere attending a school without a lunch program is less likely to receive a nutritious lunch than his more affluent classmates. A nutritious lunch, such as those offered by the NSLP, is particularly important to a poor child in its corrective value for a more generally nutritionally inadequate diet. Statistically, even if the poor child receives a lunch from his family, it is likely to be less nutritious than a NSLP lunch. Statistically it is also more likely that poor children will get no lunch than their more affluent classmates. That a child has not brought a lunch may be virtually undetectable because the child will not, out of pride, reveal it.

2. Dr. Jean Mayer, Professor of Nutrition at Harvard University, is a consultant nutritionist to the Children's Hospital in Boston and author of numerous papers and books. He is experienced in the problems of nutrition and poverty and has served as National Chairman of the Council on Hunger and Malnutrition in the United States. He also has been a Special Consultant to the President of the United States and Chairman of the White House Conference on Food, Nutrition and Health, and Chairman of the Nutrition Division of the White House Conference on the Elderly. He has had experience with the National School Lunch Program.

Dr. Richard Granger[3] testified that hunger, whether chronic or acute, interferes with the child's ability to learn. The behavior manifestations of hunger are apathy, listlessness, inability to concentrate, short attention span, and increased irritability. A poor child, more likely to have come to school without breakfast, is more likely to be hungry. This hunger leads to concentration on food to the exclusion of less appetizing academic subjects. The hungry child is also more likely to be anemic and to suffer illnesses which result in days lost from school. The result is a cycle of hunger and poverty. Dr. Granger testified, "[W]e create a situation where the poor child is hungry and can't learn, so that in the next generation he grows up to be an adult who cannot take his productive place in society, and we end up with a child in a revolving door through which poor people come and go and the rest of us just pass them by." Tr. p. 165.

For younger children the lack of a school lunch also has psychological implications. As Dr. Mayer said,

" . . . there is a feeling of benevolence in an institution that feeds you, [and] particularly for small children its important. If a school is in an area where you get a good lunch and where some adults are worrying about your getting a good lunch, this creates a very different rapport with the school than a school which is simply a place where you go and get punished or talked to if you misbehave."

Tr. p. 148

Eating a school lunch with their peers is a useful socialization experience for children. It also has a direct educational value in nutrition. The lunches served in the NSLP expose the child to a variety of nutritious foods, breaking down the tendency of children to eat a monotonous diet. Both experts testified that the nutritional value of a meal has nothing to do with whether it is hot or cold.

A nutritionist at the Providence Health Center testified that from her experience in Rhode Island she had found a higher incidence of nutritionally-related diseases such as anemia in children of low income families. It is also her experience that many of these children go to school without having had breakfast. It is her opinion that Rhode Island school children who are poor and who do not receive a NSLP lunch are less likely to be receiving adequate nutrition.

### 1970 Amendments to the National School Lunch Act

In 1970 Congress amended significantly the National School Lunch Act. The United States Department of Agriculture (USDA) promulgated regulations, pursuant to express statutory authorization, 42 U.S.C.A. § 1779, designed to implement these amendments. A general description of the changes follows. Rather than retaining discretion in local school authorities to establish maximum prices for reduced price lunches, in 1970 Congress set a ceiling of 20 cents on any reduced price lunch. 42 U.S.C.A. § 1758 (1970). For the first time state and local agencies are required to submit data on the lunch programs to the U.S. D.A. By January 1 of each year the state agency must submit a plan of child nutrition operations including plans to extend the program to every school in the state and to furnish a free or reduced price lunch to every needy child. 42 U.S. C.A. § 1759a(h)(1). The State is also required to pass on data collected from

3. Dr. Richard Granger, a physician and pediatrician, has been a consultant to various Connecticut school systems, settlement houses, and child guidance clinics. He is the Assistant Director of the Child Studies Center of Yale University, and on the faculty of Yale University Department of Public Health and of the New Center for the Study of Education. He teaches child nutrition and general pediatric care at the Yale Medical School and was a delegate to both the White House Conference on Children and the White House Conference on Food, Nutrition, and Health.

participating schools. 42 U.S.C.A. § 1759a(h)(2), (3).

Each school authority is required to provide information on the N.S.L.P. and eligibility requirements to parents. 7 C.F.R. § 245.5 (1971). Local school authorities are forbidden from asking irrelevant information on the N.S.L.P. application form, 7 C.F.R. § 245.6(a) (1971), and on submission of information of qualifying income level and family size, the children are deemed eligible. 7 C.F.R. § 245.6(b) (1971). Practices that discriminate against needy children in the lunch program are prohibited. 42 U.S.C.A. § 1758 (1970); 7 C.F.R. § 245.8 (1971). To assist state officials in planning expansion of the program, federal funds are now appropriated a year before such funds become available. 42 U.S.C.A. § 1752 (1970). While participating states must allocate three dollars to every federal dollar, the 1970 amendment requires that a certain percentage of state matching funds must come from state revenues rather than from sums collected from school children. 42 U.S.C.A. § 1756 (1970). See generally, Note, The National School Lunch Program, 1970: Mandate to Feed the Children, 60 Geo. L.J. 711 (1972).

The heart of plaintiffs' argument is to be found in the "poverty priority" language contained in 42 U.S.C.A. § 1758, as amended. Act of May 14, 1970, Pub. L. No. 91–248, § 6(a), (b), (d), (e), 84 Stat. 210–211.

"§ 1758. Nutritional and other program requirements; free and reduced cost meal eligibility and priorities; overt identification; donation of agricultural commodities; maximum utilization of donated commodities; applicability to nonprofit private schools.

Lunches served by school participating in the school-lunch program under this chapter shall meet minimum nutritional requirements prescribed by the Secretary on the basis of tested nutritional research; except that such minimum nutritional requirements shall not be construed to prohibit the substitution of foods to accommodate the medical or other special dietary needs of individual students. Such meals shall be served without cost or at a reduced cost not exceeding 20 cents per meal to children who are determined by local school authorities to be unable to pay the full cost of the lunch. Such determinations shall be made by local school authorities in accordance with a publicly announced policy and plan applied equitably on the basis of criteria which, as a minimum, shall include the level of family income, including welfare grants, the number in the family unit, and the number of children in the family unit attending school or service institutions; *but, by January 1, 1971, any child who is a member of a household which has an annual income not above the applicable family size income level set forth in the income poverty guidelines shall be served meals free or at reduced cost.* The income poverty guidelines to be used for any fiscal year shall be those prescribed by the Secretary as of July 1 of such year. *In providing meals free or at reduced cost to needy children, first priority shall be given to providing free meals to the neediest children.* Determination with respect to the annual income of any household shall be made solely on the basis of an affidavit executed in such form as the Secretary may prescribe by an adult member of such household. No physical segregation of or other discrimination against any child shall be made by the school because of his inability to pay, nor shall there be any overt identification of any such child by special tokens or tickets, announced or published lists of names, or other means. School-lunch programs under this chapter shall be operated on a non-profit basis."

(emphasis added)

National income poverty guidelines are established annually by the Secretary of

Agriculture.[4] These guidelines provide a *minimum* standard for those eligible for benefits; that is, a state may establish criteria for eligibility containing family size income levels *above* but not below this national standard. 7 C.F.R. § 245.11(a) (1971); also 7 C.F.R. § 245.3(b).

Two provisions of § 1758 arguably support the "poverty priority" urged by plaintiffs:

> " . . . by January 1, 1971, any child who is a member of a household which has an annual income not above the applicable family size income poverty guidelines shall be served meals free or at reduced cost. . . . In providing meals free or at reduced cost to needy children, first priority shall be given to providing free meals to the neediest children."

Crucial to plaintiff's case is the question of to whom this "poverty priority" mandate is directed: only to the voluntarily participating school, to the participating school district (with both participating and non-participating schools), or to the state school lunch program division of the Department of Education?

Prior to the 1970 Amendments, it was held that the poverty priority applied only to individual voluntarily participating schools or "attendance units". Briggs v. Kerrigan, 307 F.Supp. 295 (D.Mass.1969), aff'd, 431 F.2d 967 (1st Cir. 1970). In affirming the district court's judgment in *Briggs*, the First Circuit Court of Appeals, focussing on a different section of the N.S.L.P. statutes, held:

> "Second, we reject plaintiffs' assertion that an absolute need priority must be read into the statute in order to give effect to the Congressional intent. The statutory provision on which plaintiffs primarily rely requires state officials to disburse funds to individual schools 'taking into ac-

count need and attendance'. 42 U.S.C. § 1757. In our view, this language is addressed to cases in which the limited federal funds available under 42 U.S. C. § 1753 are insufficient to satisfy all the requests for aid from schools willing and able to participate. If, however, a school is unwilling to participate or unable because of a lack of facilities, we think § 1757 permits state officials to direct funds elsewhere. Certainly, § 1757 does not require officials to hold up the lunch program in schools throughout the state because a few relatively poor schools are unable to participate."

Pursuant to the 1970 statutory amendments, the U.S.D.A. has promulgated regulations which substituted "school food authority" for "school" wherever reference was made to local level Program obligations. "School food authority" is defined as "the governing body which is responsible for the administration of *one or more schools* and which has the legal authority to operate a lunch program therein." 7 C.F.R. § 210.2(p) (1971). (emphasis added) The term "school food authority" is used in the U.S.D.A. regulations effectuating the statutory poverty priority provisions:

> "Each school food authority shall serve lunches free or at a reduced price to all children whom it determines, in accordance with the requirements of this part, are unable to pay the full price of the lunch. Such standards shall specify the specific criteria to be used, respectively, for free lunches and for reduced price lunches; they shall be applicable to all schools under the jurisdiction of the school food authority; and they shall provide that all children from a family meeting the eligibility standards and attending any school under the jurisdiction of the school food authority shall be provided the same benefits."

4. Prior to the 1970 Amendments there were varying local eligibility standards. In 1968 the U.S.D.A. published guidelines, however, these guidelines were advisory, not mandatory.

7 C.F.R. § 245.3(a)

and

"In providing free or reduced price lunches to children meeting the eligibility standards for such lunches, school food authorities shall give first priority to providing free lunches to the neediest children in the schools under their jurisdiction."

7 C.F.R. § 245.4

and

"On and after January 1, 1971, the family size income criteria included in such standards and used by the school food authority shall be such that any child who is a member of a family which has an annual income not above the applicable family size income level set forth in the income poverty guidelines prescribed by the Secretary shall be served lunches free or at a reduced price."

7 C.F.R. § 245.3

and

"When the information furnished by a family in its application indicates that the family meets the eligibility standards for either a free or reduced-price lunch, the children from such a family shall be provided the free or reduced-price lunch to which such information indicates they are entitled. If a child transfers from one school to another school under the jurisdiction of the same school-food authority, his eligibility for a free or reduced-price lunch, if previously established, shall be transferred to, and honored by, the receiving school."

7 C.F.R. § 245.6(b)

■ "School food authority," then, does not refer to an individual, voluntarily participating school, but to the local contracting agent to the State N.S.L.P. agency, that is, the school district. 7 C.F.R. §§ 210.2, 245.10. In Rhode Island the local contracting agents are the representatives of district school communities and school district superintendents.[5]

■ While the administrative interpretation of the N.S.L.P. statutes, and the Court is particularly concerned with the interpretation of 42 U.S.C.A. § 1758, given by the Department of Agriculture regulations carries weight, it is not dispositive. See Zuber v. Allen, 396 U.S. 168, 192–194, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); also, Rosado v. Wyman, 397 U.S. 397, 415, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). This Court must also consider the legislative history of the 1970 amendments.

The Senate Report on the funding sections of the 1970 Amendments indicates that the purpose of these amendments was

"to provide funds and authorities to the Department of Agriculture for the purpose of providing free or reduced-price meals to needy children not now being reached."

Sen.Rep. No. 91–707, 1970 U.S.Cong. & Admin.News, p. 2487

The Senate debates on the amendments, including § 1758, show a concern for the effects of malnutrition on the health and the ability to learn of the nation's schoolchildren. See Remarks of Senator Hollings, 92 Cong.Rec. S15652. These concerns are also reflected in the Hearings on Nutrition and Human Needs before the Senate Select Committee on Nutrition and Human Needs, 91st Cong. 1st Sess. (1969). The Statement of the Managers on the Part of the House on what was to be 42 U.S.C.A. § 1758, out of

5. Thus, under U.S.D.A. regulations it would appear that the "poverty priority" applies to all school districts which have elected to participate in the N.S.L.P. This means that these districts must provide Type A lunches to all schools within the district which contain children whose families meet the income poverty guidelines, whether or not those schools have previously participated in the program. The U.S.D.A. regulations do not appear to apply to schools in districts where the district has elected not to participate. See Note, The National School Lunch Program, 1970: Mandate to Feed the Children, 60 Geo.L.J. 711, 713 (1970).

the joint conference indicated a general intent to provide lunches to the needy:

"The conference amendment to the eligibility standard for free and reduced-price lunches makes it clear that every child from a household with an income below the poverty level shall be served free or reduced-price meals.

While it is the intent of the managers that every child from an impoverished family shall be served meals either free or at reduced cost . . . it is also the intent that free lunches be provided for the poorest of the poor and under no circumstances shall those unable to pay be charged for their lunches."

1970 U.S.Cong. & Admin.News, p. 3022

The thrust of the 1970 Amendments, repeated over and over again in the Congressional history, is to combat hunger in the classroom and malnutrition. While the original enactment of the N.S. L.P. was motivated in part by a desire to encourage domestic consumption of agricultural commodities, see Briggs v. Kerrigan, 307 F.Supp. at 300, no such concern appears in the legislative history of the 1970 Amendments.

■ The legislative history of the 1970 Amendments evidences a clear Congressional intent that "any child at poverty level must receive a free or reduced price lunch and priority for free lunches must be given to neediest children." Remarks of Mr. Javits, 116 Cong. Rec. 13607 (Senate April 30, 1970). Relevant portions of the legislative history are set out at length in the appendix to this opinion.

In light of this legislative history, the U.S.D.A. interpretation of § 1758 appears to be correct. In light of this history it would be less reasonable to read the mandate that any child at poverty level must receive a free or reduced price lunch to allow school boards to install national school lunch programs in the wealthier schools under their jurisdiction but not in the poorer schools. Nor would it make sense to require the states to submit plans to expand the program and to provide free or reduced price lunches to needy children if discretion was left in the individual participating schools.

■ Thus, defendants have violated 42 U.S.C.A. § 1758 in allowing expansion of the school lunch program within participating districts without regard to providing school lunches to the neediest schools first. Defendants have also not fulfilled their duty to communicate this priority to local school district officials or to provide cost analyses of how alternate feeding systems might work.

■■ As to Central Falls, the school district which has chosen not to participate in any school lunch program, this Court cannot say that defendants are required as a matter of federal law to expand the N.S.L.P. to Title I schools, if any, in the district. It may be that defendants are required to do so as a matter of state law. R.I.G.L. § 16–8–10 (1972). The new state statute may require defendants to expand the lunch program to all needy schools within the state regardless of whether all local school districts have agreed to participate in the program. The statute is not one whose meaning is free from ambiguity. There is neither legislative history nor decisional law to assist this Court in construing § 16–8–10, R.I.G.L. (1972). This Court will abstain from deciding the constitutional issues raised by the Central Falls situation because "there [is] some likelihood that a decision could be rendered on state law grounds that would obviate the need for a federal constitutional decision." Wulp v. Corcoran, 454 F.2d 826 (1st Cir., 1972).

Having disposed of this case on statutory grounds, there is no occasion to reach plaintiffs' constitutional arguments. The Court would, however, like to express its feelings that it would be unfortunate, in light of the evidence of the effects of hunger and malnutrition on children, if needy children in this state were continued to be denied adequate lunches because school district of-

ficials chose not to participate in the school lunch program.

Accordingly, it is declared that the refusal by defendants to establish School Lunch Programs in the neediest schools first, of the participating school districts, and to provide free lunches to the neediest children first, in participating school districts, is violative of the National School Lunch Act and the regulations promulgated thereunder.

Counsel for plaintiffs and for defendants shall submit a plan for defendants to comply with the statutory mandate without undue delay. Injunctive relief shall issue on consideration by this Court of an acceptable plan for compliance.

Plaintiffs are allowed their costs. See Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972). Counsel for plaintiffs shall submit a schedule of costs.

### APPENDIX

1. Senate

From 116 Cong.Rec. 13603 et seq. (Senate April 30, 1970).

Consideration of the report of the committee of conference of the two Houses on the amendment of the Senate to the bill (H.R. 515) to amend the National School Lunch Act and the Child Nutrition Act of 1966.

Remarks of Mr. Talmadge, principal author and sponsor of the Senate bill:

"Throughout the years, changes have been made in the school lunch program. The major change was made with the passage of the Child Nutrition Act of 1966. Among other things, this act provided for pilot breakfast programs. Prior to the consideration of the pending bill, however, there has never been an overall reform of the school lunch program, and there has never before been such a concerted effort to see that a free or reduced price lunch is provided to every needy child in the Nation.

Mr. President, although the conference substitute contains several changes, it has retained intact most of the provisions of the Senate amendment. Some major provisions of the Senate amendment which were retained are as follows:

1. The restriction of the price of a reduced cost lunch to not more than 20 cents.

2. Keeping appropriations available until expended.

3. Revising the formula for apportioning non-food assistance funds and the establishment of an authorization level for non-food assistance foods.

4. Establishment of a National Advisory Council on Child Nutrition.

The conference substitute contains most of the other provisions of the Senate with only such technical modifications as were required to make it achieve its purposes. The differences are as follows:

First, the conference substitute provides for a free or reduced price lunch for each child belonging to a household whose income is below the poverty level, as determined annually by the Secretary of Agriculture, whereas the Senate amendment provided a free lunch for each child belonging to a household receiving Federal Food aid or having an income equivalent to $4,000 or less for a family of four. First priority would be given to providing free meals to the neediest children. *The conferees felt that our efforts should be directed to taking care of the children at the poverty level before providing free or reduced price lunches for those above that level.*

[T]he conference substitute requires the State plan to describe how the State will furnish a free or reduced price lunch—instead of free lunch only as provided by the Senate amendment—to every needy child in accordance with *section 9 of the National School Lunch Act. . . .*

Mr. President, the enactment of the pending legislation will be an important bench mark in the Nation's fight against hunger. This bill will be the first major antihunger bill to come out

of the current national concern with eradicating hunger and malnutrition." (emphasis added)

Remarks of Mr. McGovern, co-sponsor of the Senate bill and Chairman of the Select Committee on Nutrition and Human Needs:

"Mr. President, this is an historic day for the children of America. We have long said that our children are our Nation's greatest resource. Today we deal with legislation that affirms that principle; that redeems a promise made to our schoolchildren 25 years ago—a school lunch for every needy child.

The school lunch program is perhaps as successful as any Federal program. A great deal of the credit for this rests with the distinguished chairman of the Committee on Agriculture and Forestry, the Senator from Louisiana (Mr. Ellender), and the distinguished ranking minority member of the committee, the Senator from Vermont (Mr. Aiken). But the program has come to be one that serves some better than others, and some not at all. It is a program where that old saying 'Them that has gets' is all too true. Two-thirds of our poor children receive no lunch because they or their schools cannot afford it—while over 17 million children from more affluent families pay their 35 cents daily and take the program for granted. Three years ago the excellent study, 'Their Daily Bread,' brought this situation to our attention and made us aware of the need for legislative change in the national school lunch program. That started us on the road that led to this day. . . .

*Even more important, the conference report retains the language of section 6 of S. 2548 that every needy child 'shall be served meals.' This is perhaps the most important phrase in all the legislation dealing with child nutrition. It creates, as the distinguished Representative from Illinois, Mr. Pucinski, so eloquently stated it during the conference, 'a right to a school lunch.' This is a right bestowed on the children of America. A right that we expect will be vigorously exercised in their behalf.*

*Without this vital language, and the right it creates, all our efforts at reform would be meaningless and empty. Our children would have only a promise, a hope rather than a right.*

*By using this language of entitlement, the Congress has made a firm commitment that it will not allow 5 million hungry schoolchildren to grow up half educated, unemployable, and dependent because they lacked proper nourishment during their formative years when they were undergoing the learning process."*

(emphasis added)

Remarks of Mr. Spong, co-sponsor of the Senate bill:

"Last year, I visited a number of school lunch programs throughout the State of Virginia. I had numerous school and medical personnel tell me of the benefits of the program: That children who had been properly fed were more alert, more anxious to learn, less of a discipline problem.

Recent medical studies have tended more and more to demonstrate a direct relationship between good nutrition and mental development.

Fortunately, my State of Virginia has had a relatively high participation rate in the school lunch program— about 57 percent of all schoolchildren in the State participate.

Unfortunately, however, at least 100,000 Virginia schoolchildren who need access to the school lunch program do not now have such access.

Under the terms of the conference bill, these children could be brought under the program.

There is, it seems to me, no doubt that we need a school lunch program in every school and that every hungry child needs access to that program.

That was my purpose in cosponsoring this legislation and that is my purpose in supporting it today.

*The language in the conference bill is direct.*

*It says that as of January 1, 1971:*

*Any child who is a member of a household which has an annual income not above the applicable family size income level set forth in the income poverty guidelines shall be served meals at free or reduced costs.*

*That is the heart of this bill."*
(emphasis added)

Remarks of Mr. Javits, cosponsor of the Senate bill:

"Under this standard, set in the conference report, States and local schools will no longer be able to be arbitrary in the determination of which children will receive free or reduced price meals as was the case in the past. The law will be clear: any child at poverty level must receive a free or reduced price lunch and priority for free lunches must be given to neediest children. This makes the intent of the Congress crystal clear that poor children can no longer be denied free or reduced cost lunches.

I am pleased that the conference adopted my provision which set 20 cents as the maximum cost of a reduced price lunch. The purpose of reduced cost lunches is to bring meals to children who could not afford the meal at the regular price. The previous lack of definition allowed districts to provide reduced cost meals at only a trivial reduction off the regular price. I believe that by establishing 20 cents to be the maximum cost of such lunches, participation in the lunch program by needy children will mushroom. Studies have shown that the lower the price, the greater the participation."

2. House of Representatives

From 116 Cong.Rec. 13991 et seq. (House May 4, 1970)

Consideration of the conference report on the bill (H.R. 515) to amend the National School Lunch Act and the Child Nutrition Act of 1966.

Remarks of Mr. Perkins

"Mr. Speaker, it is with great pride that I present today the conference report on H.R. 515. This bill creates a new charter for the child nutrition programs. It will strengthen the State and local administration of these programs and it will extend and improve their nutritional benefits to all children, especially to those children who come from poor families.

The history of this bill is worthy of brief review. It was first introduced nearly 2 year ago as H.R. 17873, on January 14, 1968. This action was an outgrowth of a series of hearings held by the House Education and Labor Committee on the subject of malnutrition and Federal food programs. Testimony from many groups brought out clearly the need for greatly expanded efforts to provide better nutrition for our Nation's children."

Remarks of Mr. Quie

"Much attention has been focused specifically on the new eligibility language in section 9 which states:

Free lunches shall be served to low-income children or children being eligible for school lunches.

The wording in my judgment is academic because the existing School Lunch Act, in section 9, the third sentence, now reads:

Such meals shall be served without cost or at a reduced cost to children who are determined by local school authorities to be unable to pay the full cost of the lunch.

Mr. Speaker, our action in conference takes the basic concept already in the law and expands it so that all poor children shall be served free or reduced-price meals on a standard as determined by the Secretary of Agriculture. The discretion for determination as presently written in the law remains with the local school authority.

What we did in this legislation, the conference report, is to specify a national standard that shall apply to local school boards. So, as it was written

previously into law, such meals free or at lowest cost shall be served, but instead of left entirely to the discretion of the local school system a child coming from a family which is below the poverty level, $3,800, nonfarm; and $3,200, farm, must be served free or lowest cost lunches. The local school authorities retain their authority to provide free or reduced cost lunches for children who come from a family whose income is above the poverty lines. . . .

We also have provisions here and language requiring that the State develop means of extending their school lunch program so that all of the schools within the State will be covered because at the present time not all of the schools are covered. This is especially difficult in some areas where the schools are extremely old. . . .

Conventional thinking in the programs for feeding children tended toward duplicating restaurant-type facilities. Many of the newer suburban high schools and even elementary schools have gone this route. The parents can and are willing to support this type of operation.

But what do you do about feeding the youngster in overcrowded, old, elementary schools in downtown areas? Time was when the children attending these schools were expected to and did go home for lunch. It might have been a good lunch of a pickup kind of lunch— or it may not have been any lunch at all, if the school is in a ghetto area.

Times have changed. Now poor families in ghetto areas have greatly expanded. Also around our old schools we also have working mothers. Many by choice, but a great many because they have to. We have heard for years about the 'door-key' or 'latch-key' children who, by force of circumstances, must shift for themselves quite a few hours of the day.

With the new technology, any school in this country can provide a good meal for these children—can keep them from

wandering the streets or dropping into the neighborhood store for empty calories that appease hunger but do nothing for nutrition."