Archie BRIGGS et al., Plaintiffs,

v.

John T. KERRIGAN et al., Defendants.

Civ. A. No. 69-747.

United States District Court

D. Massachusetts.

Dec. 11, 1969.

Gershon Michael Ratner, Boston Legal Assistance Project, Boston, Mass., Stephen Rosenfeld, Lawyers Committee for Civil Rights Under Law, Boston, Mass., for plaintiffs.

James J. Marcellino, Asst. Atty. Gen., Boston, Mass., for Comm. of Mass., Dept. of Education.

Edith W. Fine, Boston, Mass., and Herbert F. Travers, Jr., U. S. Atty., William J. Foley, Asst. U. S. Atty., Irwin Goldbloom and Howard B. Pickard, Dept. of Justice, Dept. of Agriculture, Washington, D. C., for Kerrigan, Eisenstadt, Lee, McDevitt, Tierney, Ohrenberger & Richards.

## OPINION

GARRITY, District Judge.

The National School Lunch Act, 42 U.S.C. § 1751 et seq., provides federal assistance to local school lunch programs which implement the federal design to provide nutritious noon meals for our nation's youth at nonprofit and nonprohibitive prices. Plaintiffs complain that this program as administered in the Boston public school system violates both the Act and the Constitution of the United States. The court has heard the parties on crossmotions for summary judgment.

## I Provisions of the Act

An understanding of the operation of the Act is essential to an analysis of the parties' contentions. The federal government, through the Department of Agriculture, assists states, primarily by grants of financial aid, in providing for the establishment, maintenance, operation and expansion of nonprofit school lunch programs. 42 U.S.C. § 1751. The amount of funds available to any particular state depends on the degree of its participation in terms of the number of lunches served under the program. That number is multiplied by a factor called the assistance need rate of the state. For all states whose per capita income is equal to or greater than that of all the United States, the rate is 5. For states with lower per capita income the rate is greater than 5 but no more than 9, the difference depending on its relative poverty when compared to the whole of the United States. The product of the participation rate, i. e., the number of lunches served, and this assistance need rate produces an index. The indices of all the states are added and then applied to the funds available through Congressional appropriations. 42 U.S.C. §§ 1753 and 1760, 7 C.F.R. § 210.4.

Funds so apportioned, however, will not be paid to the states unless each federal dollar is matched by three dollars from sources within the state, including amounts paid by the schoolchildren. There is an exception, not applicable to Massachusetts, for those states whose assistance need rate is above 5. For them the matching requirement is decreased by the percentage which the state per capita income is below the per capita income of the United States. 42 U.S.C. § 1756, 7 C.F.R. § 210.6(a). Thus under both the apportionment section (§ 1753) and this matching section (§ 1756) the assistance need rate comes in to provide

the poorer states greater proportional assistance than the wealthier states.

The federal aid is generally limited to reimbursement for expenses of food costs and program administration. The federal government does not pick up any part of the expenses attributable to the use of land or for the acquisition, construction, or alteration of buildings. 7 C.F.R. § 210.6(b).

Accordingly, states wishing to take part in the program must be willing to provide, at some level of involvement, whether statewide or local, certain basic facilities and to underwrite a substantial portion of the program's continuing costs. In order to participate, states through their education agencies enter into written agreements with the Department of Agriculture undertaking the responsibility of administering the program in accordance with the provisions of the Act. 42 U.S.C. § 1756.

Under § 1757 [1] the state agency, taking into account need and attendance, determines the eligibility of schools for participation in the school lunch program. Before any of the combination of federal and matching state funds may be disbursed by the state to these schools there must be an agreement executed between the state agency and the school seeking participation. This agreement is subject to the approval of the Secretary of Agriculture. § 1757, 7 C.F.R. § 210.8(d).

Section 1758 [2] of the Act contains the program requirements that must be implemented by the state and the schools participating in the program. One of these requirements, the one most relevant here, is that lunches must be served without cost or at a reduced cost to children who are determined by local school authorities to be unable to pay the full cost of the lunch. No physical segre-

1. "Funds paid to any State during any fiscal year pursuant to sections 1753 or 1754 of this title shall be disbursed by the State educational agency, in accordance with such agreements approved by the Secretary as may be entered into by such State agency and the schools in the State, to those schools in the State which the State educational agency, taking into account need and attendance, determines are eligible to participate in the school-lunch program. Such disbursement to any school shall be made only for the purpose of reimbursing it for the cost of obtaining agricultural commodities and other foods for consumption by children in the school-lunch program and non-food assistance in connection with such program. Such food costs may include, in addition to the purchase price of agricultural commodities and other foods, the cost of processing, distributing, transporting, storing, or handling thereof. In no event shall such disbursement for food to any school for any fiscal year exceed an amount determined by multiplying the number of lunches served in the school in the school-lunch program under this chapter during such year by the maximum Federal food-cost contribution rate for the State, for the type of lunch served, as prescribed by the Secretary." 42 U.S.C. § 1757.

2. "Lunches served by schools participating in the school-lunch program under this

chapter shall meet minimum nutritional requirements prescribed by the Secretary on the basis of tested nutritional research; except that such minimum nutritional requirements shall not be construed to prohibit the substitution of foods to accommodate the medical or other special dietary needs of individual students. Such meals shall be served without cost or at a reduced cost to children who are determined by local school authorities to be unable to pay the full cost of the lunch. No physical segregation of or other discrimination against any child shall be made by the school because of his inability to pay. School-lunch programs under this chapter shall be operated on a nonprofit basis. Each school shall, insofar as practicable, utilize in its lunch program commodities designated from time to time by the Secretary as being in abundance, either nationally or in the school area, or commodities donated by the Secretary. Commodities purchased under the authority of section 612c of Title 7, may be donated by the Secretary to schools, in accordance with the needs as determined by local school authorities, for utilization in the school-lunch program under this chapter as well as to other schools carrying out nonprofit school-lunch programs and institutions authorized to receive such commodities." 42 U.S.C. § 1758.

gation of or other discrimination against any child may be made by the school because of his inability to pay.

Aid to participating schools takes the form of reimbursement of expenses in connection with lunches served in accordance with the provisions of the program. The Act provides a formula for a maximum amount of reimbursement, based on the number of lunches served to the children in the school multiplied by an assigned rate for each meal. With certain exceptions for needy schools, the maximum assigned rate is 9 cents per lunch. According to the deposition in this case of defendant John C. Stalker, the director of the Office of School Lunch Programs and Nutrition Education in the State Department of Education, the Commonwealth of Massachusetts has added to the federal grant whatever state funds have been required to bring the reimbursement of municipalities whose schools are participating in the program up to the 9 cents per lunch ceiling.

Just as state participation in the federal program is nonmandatory so too is participation by local communities in Massachusetts. The state agency leaves to the determination of local governments whether or not lunches will be offered in its schools. This is partially due to the fact that the bulk of the expenditures for initiating and continuing the school lunches within the Commonwealth is intended to be borne at the local level. Although participating municipalities will receive the maximum rate of reimbursement from state and federal contributions, they still must be willing to give considerable support to the program themselves. First, they must provide certain basic facilities necessary for making and serving lunches to the schoolchildren. Funds from the federal gov-

ernment or from the Commonwealth are tied directly to the number of lunches actually served and do not include payments for rent or for the acquisition, construction or alteration of buildings.[3] Secondly, they bear part of the continuing costs of administering the program. Thus the City of Boston, through its school committee, makes up the difference between the grants received from the federal and state governments and the amounts received from the students on the one hand and the actual costs of administering the programs in individual schools on the other. During the school year 1967–68, pupils paid 69% of the cost of administering the school lunch program in Boston, the federal-state program 17%, and the City of Boston 14%. For 1968–69 corresponding percentages were 70%, 22% and 8%, and for 1969–70, as projected, 70%, 25% and 5%.

In Massachusetts the role of the state agency in determining which schools may participate in the program has been insignificant. Individual school committees desiring to participate apply for aid on behalf of one or more schools within their jurisdictions. Each school must signify its willingness to abide by the provisions of the Act and the federal-state agreement by executing an agreement in its own behalf with the state agency. In Massachusetts, the state agency has never rejected an application on behalf of such a school. Although the state agency has endeavored to encourage school systems without a school lunch program to institute one, its passive system of selection has permitted discretion in local authorities not only with respect to applying for aid in the first place but also with respect

---

3. Such expenses cannot be included among funds from sources within the states for the purpose of matching federal grants. 7 C.F.R. § 210.6(b). "Funds from sources within the state shall include: (1) funds expended for the Program, including program administration, by the state or its political subdivisions or by or on behalf of any school, from children's payments or from any other source of state or local funds *except funds expended for land or the acquisition, construction or alteration of buildings. * * *"* (Emphasis added.) There is no indication that in Massachusetts there is any other source of state aid to municipalities for providing lunchroom facilities.

to selecting the schools to be the beneficiaries of any application.

The City of Boston participates in the program and has received aid pursuant to agreements with the state agency on behalf of virtually all its high schools and junior high schools and 14 out of 150 of its elementary schools. Out of the total of 51 schools which make lunches available, 39 make lunches for their students with facilities on their own premises. These schools have kitchens with refrigeration, cooking facilities, storage areas and cafeterias. These schools make hot lunches and the students eat them in the cafeterias. The remaining 12 schools which serve lunches do not have their own facilities except for milk refrigerators. Lunches are brought to them every morning by truck from other nearby schools where they are made. Ten of the 12 schools receive and serve cold lunches and the other 2 receive and serve hot lunches. At these 12 schools children eat the lunches in their classrooms. None of the schools which do not serve lunches have kitchens, cafeterias, food storage areas, common rooms or refrigerators other than milk refrigerators. The explanation for provision in the 12 schools without facilities is contiguity to two schools in which existing facilities were not being used to capacity. Thus in Boston the sole determinant for participation in the National School Lunch Program is the presence or absence of kitchen and lunchroom facilities either on the premises or nearby.

However, in some schools where there is no provision for lunches there is a greater concentration of nutritionally and economically needy children than in some where lunches are distributed. Therefore, some students with great economic and nutritional needs are not receiving lunches while other less needy children are.

Plaintiffs contend that an administration of the program producing such a result is a violation of the provisions of the National School Lunch Act. They read that part of § 1757 by which state agencies are directed to take need and attendance into account when determining eligibility for participation to mean that the state must give priority in its selection of schools to those whose students have the greatest economic and nutritional needs. Furthermore, by interpreting the word "schools" in § 1758 to mean school systems or committees rather than individual units of attendance, they read the requirements of that section to mean that as long as the Boston School Committee participates in the National School Lunch Program, it must provide reduced price or free lunches to all students unable to pay the full cost of the meal, whatever particular school unit they attend, as a condition to serving lunches to any other school child.

Plaintiffs also contend that a distribution of benefits under the Act which does not cover all students nor give a priority to the neediest but conditions participation on the existence of facilities results in an arbitrary discrimination not rationally related to the purposes of the Act and is therefore a violation of the Fifth and Fourteenth Amendments to the Constitution of the United States. State and federal officials have been joined as defendants on the theory that they have approved an illegal and unconstitutional administration of the program and have allowed it to persist despite their power to change it by withholding further funds until constitutional conditions are met.

## II  Legislative History

Thus a fundamental issue concerns a question of statutory interpretation in light of the purposes of the Act: does it provide for a priority based on nutritional and economic need? Both the declaration of the policy of the Act and its congressional history[4] indicate

4. We have turned to an examination of the legislative history of the School Lunch Act as an aid in determining the purpose of that statute. According to Suther-

that it was intended to advance two objectives: the preservation of the health and well-being of the nation's youth and the encouragement of domestic consumption of agricultural commodities. See 42 U.S.C. § 1751 and House Report No. 684, 79th Cong., 1st Session, June 5, 1945, p. 2.

The purpose of creating a substantial agricultural market would best be effectuated by the widest participation possible. The more children involved, the greater the potential market. Given any particular appropriation, money spent implementing a priority for needy children would not be available for purchase of agricultural commodities.[5] This aspect of the legislative purpose, then, does not support plaintiffs' contention.

With respect to the purpose of safeguarding the health and well-being of the nation's children, Congress was concerned with those segments of our population with insufficient means to provide a nutritional diet for their children. The congressional deliberations show a recognition that dietary needs were most pressing in the school districts of least wealth and that the Act should contain nothing that might make it more difficult for those districts to participate in the program. See 92 Cong.Rec. 1452–1495, Part 2, 1946 (especially the remarks of Rep. Voorhis at 1485–1486).

This concern is reflected in the Act. As already stated, sections 1753 and 1756 provide for a disbursement of funds that will assure a greater proportional share to those states of relatively low per capita income. Under § 1758 the poor are to receive their lunches free or at reduced prices and under the 1962 amendments special assistance is provided to schools drawing attendance from areas in which poor economic conditions exist. 42 U.S.C. § 1759a.

On the other hand, the congressional deliberations show that it was not only those in economic need that would benefit from the provision of school lunches. Potentially all schoolchildren could be aided by the program. There was a constant awareness that poor nutrition was not confined to poor families. See, e. g., 92 Cong.Rec. 1455, 1471–1472, Part 2, 1945 (remarks of Rep. Flannagan at 1455 and remarks of Reps. Granger and Voorhis at 1471–1472). The House Report noted that the benefits from school lunch programs were not limited to any particular class of children but rather took place "on all income levels inasmuch as an adequate lunch at school or adequate nutrition is not necessarily assured by the higher income of the parents." House Report No. 684, 79th Cong., 1st Session, June 5, 1945, p. 2.

The Senate Report mentioned three conditions preventing adequate nutrition and only the last of these related to the lack of economic means. The first was ignorance of the elements of proper nutrition in rich and poor alike. In this regard the Act was seen as valuable to both parent and child on the theory that the child would carry home to his parents the good nutritional habits developed at school. The second condition preventing adequate nutrition was the difficulty encountered by a child in obtaining a proper lunch at school. The report cited the increase in distances from home to school and the increased incidence of working mothers as compounding these difficulties. Senate Report No. 553, 79th Cong., 1st Session, July 28, 1945, p. 9. These are circumstances not limited to families from poor

land, Statutes and Statutory Construction (3rd ed. 1943) Vol. 2, § 5003, pp. 484, 485, "Logically the events occurring immediately prior to the enactment of the statute ought to be a most lucrative source for information indicative of the legislative intent embodied therein. Therefore, the history of the measure during its enactment, that is, during the period from its introduction in the legislature to its enactment, has generally been the first extrinsic aid to which courts have turned in attempting to construe an ambiguous Act."

5. Not until 1962 was § 1759a added providing separate funds for schools drawing attendance from poor areas to help them to meet the requirements of § 1758.

communities but would apply to school students generally.

Furthermore, during the congressional consideration of the 1962 amendments already mentioned especially 42 U.S.C. § 1759a, there was explicit awareness of the type of situation presented in the instant case. At the subcommittee level there was an amendment proposed which would have authorized an experimental three-year program designed to provide lunches in schools which were not participating because of inadequate facilities. It was noted that very often these were schools in the poorest areas. This amendment was rejected in favor of a recommendation that the Secretary of Agriculture study the problem with a view to expanding the lunch program to those schools currently eliminated only because of lack of facilities. See Senate Report No. 2016, 87th Cong., 2d Session, Sept. 7, 1962, p. 11; U.S.Code Cong. & Admin.News 1962, p. 3244.

█ Plaintiffs contend that because § 1757 of the Act requires the state educational agencies to take into account "need and attendance" in determining eligibility for participation, they must select schools in areas of economic need before they may select any other schools. Though the precise meaning of this requirement is not entirely clear, given the history of the statute it cannot have the meaning the plaintiffs contend. A priority of such significance would not be couched in such ambiguous terms. It would be stated with the clarity of expression exhibited in the Child Nutrition Act, 42 U.S.C. § 1771 et seq., where the priority is made explicit:

"In selecting schools, the State educational agency shall, to the extent prac-

ticable, give first consideration to those schools drawing attendance from areas in which poor economic conditions exist * * *." 42 U.S.C. § 1773(c).

█ Plaintiffs' argument under § 1758, that free or reduced-price lunches must be made available to students who cannot afford a full-priced meal despite the fact that the school they attend does not provide lunches, is based on the words "schools" and "school" meaning school systems or committees.[6] The plain language of the section, however, appears to refer to attendance units which are already participating in the program. Under this interpretation, § 1758 demands that in those attendance units in which school lunches are available they must be made available even to those who cannot afford to pay for them and this must be done in a manner which will not single out these poorer students. Read in this light, the requirements of § 1758 are met by the Boston school system.

Accordingly, we conclude that neither the purpose nor the language of the statute, as construed in the light of its legislative history, supports the plaintiffs' contention that there is an express or implied statutory requirement that lunches be made available to schools and students according to economic need. In the court's opinion, the purpose of the National School Lunch Act was the federal stimulation and encouragement to expansion of state and local programs to provide nutritionally adequate lunches at all schools and to all students, rich and poor alike.[7] See, e. g., 92 Cong.Rec.

---

6. The relevant language of § 1758 in this regard is as follows: "Lunches served by *schools* participating in the school-lunch program under this chapter shall meet minimum nutritional requirements * * *. Such meals shall be served without cost or at a reduced cost to children who are determined by local school authorities to be unable to pay the full cost of the lunch. No physical segregation of or other discrimination against any

child shall be made by the *school* because of his inability to pay." (Emphasis added.)

7. "Federal assistance to school lunch programs must seek to further the following basic objectives if it is to meet the needs of the children, of the school community and of agriculture: (1) to stimulate and to help make it possible for all schools to make a nutritious noon lunch available at cost to all children, and at less than

1537, Part 2, 1946 (remarks of Rep. Lemke, "I believe these lunches should be given regardless of how wealthy or how poor the parents may be.") Therefore, the administration of the Act in Boston does not violate the statute.

### III  Constitutional Issues

Turning to the constitutional issues: all students in the Boston public school system are equally entitled to lunches under the Act and some are not receiving them. This unequal bestowal of benefits results from the local authorities having applied for participation only on behalf of schools that can be serviced by existing facilities. They have chosen not to incur substantial additional expenses for providing necessary facilities in all Boston schools or outside facilities that can service these schools. Thus, though all are entitled to receive lunches, not all are in the same position with respect to expenses necessary to make the program applicable throughout the city. Is this underinclusive classification justifiable in a manner compatible with the equal protection clause of the Fourteenth Amendment?

Judicial inquiry under the equal protection clause into areas of unequal treatment under law demands a standard of classification which is neither arbitrary nor creative of an invidious discrimination but reasonable when judged in light of the objectives of the legislation. See, e. g., Rinaldi v. Yeager, 1966, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577; McGowan v. Maryland, 1961, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed. 2d 393; Tigner v. Texas, 1940, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. See generally, Note, Developments in the Law—Equal Protection, 1969, 82 Harv. L.R. 1065. Legislative bodies, however, are given rather wide latitude in their judgments as to the reasonableness of classifications. "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, *supra*, 366 U.S. at 425–426, 81 S.Ct. at 1105.

In the instant case, the *de jure* classification produced by the administration of the school lunch program in Boston is not such that a defined class of citizens has been singled out and invidiously discriminated against on a permanent basis. Cf. Brown v. Board of Educ., 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. The line drawn between students who will receive the program's benefits and those who will not is neutral, depending solely on the availability of facilities. Moreover, though the plaintiffs are poor citizens of Boston, that line is not so drawn as to produce a *de facto* classification between the wealthy and the poor. There is no pattern such that schools with lunch programs predominate in areas of relative wealth and schools without the program in areas of economic deprivation.[8] Nor is there any discrimination against the poor in the sense that the exercise of a fundamental right which under the Constitution of the United States should be equally attainable to rich and poor alike,

cost to those who need such lunches but are unable to pay the full cost." Senate Report No. 553, 79th Cong., 1st Session, July 28, 1945, p. 6.

8. The fact that there is a lunch program in virtually every high school and junior high school in Boston indicates that there could not be any wealth oriented discrimination at least with respect to that level of schooling. If there is any *de facto* classification at all, it is between elementary schools and high schools. Out of 51 schools covered, only 14 among the total of 150 elementary schools receive lunches, while all 37 of the high schools are serviced. But nothing turns on that because there is no contention that a disproportionate number of those 14 elementary schools draw attendance from areas of relative wealth. The contention is rather that the poorer areas are simply not given a priority, that is, that there is not a discrimination in their favor.

such as the right to vote or the right to an effective criminal appeal, is conditioned in a way that puts a price on the privilege, thus precluding the poor because of their inability to pay. See Harper v. Virginia State Board of Elections, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 and Griffin v. Illinois, 1956, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891.

There is no price on participation in the program. Therefore, no relative disadvantage to the poor inheres in the Act or its administration. Here poverty is its own disadvantage. The fact that relatively wealthy parents are better able to see that their children have an overall nutritious diet and that therefore the poor have the greatest need for lunches at school is a product of the disparity in material circumstances between the relatively rich and the poor and not the result of any aspect of the school lunch program. As heretofore explained, the National School Lunch Act is not primarily a welfare program. ■ This does not mean, however, that the poverty of the plaintiffs is an irrelevant consideration. The reasonableness of a classification, even though it does not discriminate invidiously between the rich and the poor, should also be considered in terms of the harshness of its results. An administration of the School Lunch Act which does not benefit all who are logically within the scope of the Act is especially harsh on poor persons like the plaintiffs. Some needy persons are in effect receiving welfare benefits denied others simply because they happen to attend a school with lunchroom facilities and are able to get free or reduced-price lunches. Moreover, some children from wealthy homes are able to buy lunches at prices discounted by reason of governmental subsidies while some poor students are pro-

vided with no aid whatsoever. The court nevertheless concludes that this inequality, though unfortunate, is constitutionally permissible. The basis of the classification, i. e., the reason for the differing treatment, is not arbitrary or capricious. The decision not to undertake immediate sizeable capital expenditures to provide cafeteria facilities in nonparticipating schools or to build central kitchens and maintain trucking services to these schools so that lunches would be available to all that might need them, even in light of the harshness of its results to some grammar school pupils, is not so unreasonable as to reach constitutional dimensions.[9]

The situation presented here is comparable to that in McInnis v. Shapiro, 1968, N.D.Ill., 293 F.Supp. 327, aff'd sub nom. McInnis v. Ogilvie, 1969, 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308 in which a three judge court upheld a state statutory system of financing education through local property taxation which resulted in wide variations in per pupil expenditures for schooling from district to district. That result followed inevitably from the fact that taxable wealth varies so widely from area to area. See generally Michelman, The Supreme Court 1968 Term Foreword: On Protecting the Poor Through the Fourteenth Amendment, 1969, 83 Harv.L.R. 7, especially 47–59. Though the inequalities were recognized in the *McInnis* case as readily apparent and though "no clearer or socially more significant case of wealth related disadvantage is imaginable," Michelman, *supra* at 48, the system was not found unconstitutional. The Supreme Court rejected the contention that only a financing system which apportions public funds according to educational needs would satisfy the Fourteenth Amendment and held that the school legislation under attack was nei-

9. It should be noted that efforts are being made at every level of involvement in the program to expand it, especially to reach those in the poorer communities. This is evidenced by the 1962 amendments to the School Lunch Act and the Child Nutrition Act of 1966. It also appears to be the policy of the Boston School Committee. New schools in Boston must have complete kitchen and lunchroom facilities. There is in the planning stage a pilot program for certain areas of the city for a central kitchen that will supply lunches to some contiguous school districts.

ther arbitrary nor creative of an invidious classification. Rather it ruled that the state design allowing local choice and experimentation in the allocation of its revenues to competing needs such as schooling and police protection was reasonable. McInnis v. Shapiro, *supra*, 293 F.Supp. at 332, 333, 89 S.Ct. 1197.

Contrary to the plaintiffs' contention, the instant case is not controlled by the reasoning in such cases as Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; Dews v. Henry, D.Ariz., 1969, 297 F.Supp. 587, or Westberry v. Fisher, D.Me., 1969, 297 F.Supp. 1109. In the *Shapiro* case the Supreme Court held that state minimum residency requirements for welfare benefits produced an invidious classification and were not justified by a legitimate state objective. In the other two cases certain statutory ceilings for welfare grants were held invalid by federal district courts because they tended arbitrarily to discriminate against families with many children. The principle that a classification is not justified simply by the desire to conserve public funds is stated clearly in the opinion of the Court in Shapiro v. Thompson, *supra*, 394 U.S. at 633, 89 S.Ct. at 1330:

> We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot be an independent ground for an invidious classification.

It does not follow that state and federal programs affecting citizens unequally are all unconstitutional if some hypothetical appropriation of funds would produce equal benefits to all citizens.

If in order to save costs Boston were to eliminate from the program half of the schools that do have kitchen facilities, the situation would then be similar to that in the *Shapiro* case. Here, however, what Boston has avoided are expenses unique to schools without facilities and of a totally different nature from those it is already incurring as costs of administration of the program. Boston's fiscal purpose is therefore not arbitrary. Tax dollars must be allocated among a wide range of competing community interests.

The basic problem reflected in these proceedings is, of course, the level of the general welfare, which has not reached a point where in this land of plenty no child will go hungry. This is a problem of immense magnitude with legislative bodies the institutions of government most suited to bring about the needed changes. See generally, Note, Discriminations Against the Poor and the Fourteenth Amendment, 1967, 81 Harv.L.R. 435, 442.

Plaintiffs' motion for summary judgment is denied and the defendants' cross-motion for summary judgment is granted. Judgment will be entered for the defendants dismissing the action.