Jacqueline **JUSTICE** et al., Plaintiffs,

v.

The **BOARD OF EDUCATION**, City School District of the City of Mount Vernon, New York, et al., Defendants.

**No. 72 Civ. 2339.**

United States District Court,
S. D. New York.

Nov. 9, 1972.

The Legal Aid Society of Westchester County, Mount Vernon, N. Y., for plaintiffs; Mark A. Chertok, Dana H. Freyer, Mount Vernon, N. Y., Norman B. Lichtenstein, White Plains, N. Y., of counsel.

Joseph R. Zibelli, Mount Vernon, N. Y., for defendants.

## OPINION

FRANKEL, District Judge.

Over a quarter-century ago Congress passed the National School Lunch Act[1] "to safeguard the health and well-being of the Nation's children"[2] or, as more broadly stated in the course of fashioning later amendments, to assure that "every child from an impoverished family shall be served meals either free or at reduced cost."[3] Despite those stated goals of the world's richest country, millions of our children continue to go without adequate lunches. Some of those children bring this action—styled, probably advertently and perhaps symbolically, Justice, et al. v. Board of Education, et al.—to claim that the National School Lunch Act and the Constitution forbid that deprivation.

For brief background purposes at this point, the School Lunch Act may be described as providing federal money (to be matched by state-generated funds) and agricultural commodities to give free or reduced-price lunches to needy school children. State and local participation is voluntary—or may at least be deemed to be for present purposes. There is a primary issue in this case, however, as there has been in prior litigation under the Act, as to whether, and to what extent, a school district or other local unit may provide lunches for less than all the needy children (or schools) under its jurisdiction. Other questions concern (1) the order in which children are to be brought within lunch programs, assuming that some are to be postponed or excluded, (2) alleged deprivations of lunches to children entitled thereto despite their families' "ineligibility" because of their level of income, and (3) the claim that because of local procedural arrangements children are identified to everyone as recipients of public largesse, contrary to the command of the federal statute forbidding such stigmatization.

According to the undisputed allegations of the verified complaint, together with other facts stipulated or uncontested, the City of Mount Vernon, New York, has 14 public schools operated by defendant Board of Education.[4] The total student population is approximately 11,900. 4,820 of these come from low-income families (i. e., families with yearly incomes of $4,000 or less), and thus meet federal eligibility standards for free lunches. Exercising leeway given by the federal law, defendant Board has adopted the more generous criteria of eligibility suggested by the New York State Department of Education, so that the number of eligible students is proba-

---

1. Act of June 4, 1946, 60 Stat. 230, as amended, 42 U.S.C. § 1751 et seq. (1970).

2. 42 U.S.C. § 1751 (1970).

3. Statement of the Managers on the Part of the House, H.R.Rep.No.91–1032, 91st Cong., 2nd Sess. 9 (1970), U.S.Code Cong. and Admin.News, p. 3022.

4. There are several defendants in addition to the Board and its members. Nobody suggests any point in dealing separately or differently with any defendant.

bly higher than 4,820.[5] In any event, it is stipulated that only 440 of the eligible children actually receive meals under the school lunch program.

The explanation for this—and the source of the main question in the case —is that, while defendant Board participates in the program, lunches under the program are served in only four of Mount Vernon's 14 schools.[6] The four schools (the high school, middle school, and two elementary schools) have been selected because they have cafeterias or other facilities useful for serving lunches.[7] The selection basis has not included the rate of need in each school's population. Seven of Mount Vernon's elementary schools have sufficient concentrations of children from low-income families to receive assistance under Title I of the Federal Elementary and Secondary Education Act of 1965.[8] Nevertheless, only two elementary schools operate a lunch program, and one of this number does so with special federal funds.[9]

Among the results of defendants' confining the lunch program to four schools are (a) children in great need receive no lunches while less needy children are fed; (b) schools with relatively few needy children have lunches while schools with as many as 90% poor children do not; and (c) siblings in "eligible" families are treated differently, depending upon which school they happen to attend.

In the four schools under the lunch program parents receive an information letter and application form. The letter reports the eligibility standards in terms of family size and gross income.[10] However, neither the letter nor the application discloses that children whose families have more than the stated gross incomes may obtain free or reduced-price lunches upon a showing that they cannot afford to pay.

The four schools operating lunch programs serve some 2,200 lunches daily. Thus, almost 1,800 students pay "full prices" for their lunches though they are, of course, benefited by (a) federal grants averaging $.06 as "general assist-

5. Defendant Board has promulgated the following criteria for a free lunch:

| Number in Family Unit | Gross Annual Income | Monthly Income |
|---|---|---|
| 1 | $2100 or under | $175.00 |
| 2 | 2850 " " | 237.50 |
| 3 | 3550 " " | 295.83 |
| 4 | 4250 " " | 354.17 |
| 5 | 4900 " " | 408.33 |
| 6 | 5550 " " | 462.50 |
| 7 | 6150 " " | 512.50 |
| 8 | 6750 " " | 562.50 |
| 9 | 7300 " " | 608.33 |
| 10 | 7850 | 654.17 |
| Each additional Member | 500 " " | 41.67 |

6. Thus the federal (and relaxed local) eligibility criteria are operative only in the four schools under the lunch program. Lunches are also served to approximately 70 students in the Young Mothers' Educational Development Program in a fifth school.

7. The Nathan Hale elementary school participates with funds obtained under the Federal Model Cities legislation, Act of November 3, 1966, 80 Stat. 1256, 42 U.S.C. § 3303 (1970). The only elementary school serving lunches under the National School Lunch Program is the Traphagen School, which is located in a more affluent neighborhood.

8. 20 U.S.C. § 241a et seq. (1970).

9. Note 7, *supra*.

10. See note 5, *supra*.

ance" for each paid lunch,[11] (b) the convenient supplying of wholesome food and, probably, (c) the incidental economy accomplished through the federal grant of surplus agricultural commodities and a non-profit restaurateur.[12] In purported compliance with the federal prohibition against "segregation * * or other discrimination" or "overt identification * * * by special tokens or tickets, * * * or other means"[13] the Board has provided that (a) needy beneficiaries will be given special tickets with which to obtain their lunches and (b) children who pay may either purchase (monthly) and use similar tickets or pay directly in cash. The ring-up on the cash register is the same for all students, whether payment is made by ticket or cash. However, among the 1,775 or so who pay for their lunches, only 20 purchase tickets in advance, the others presenting currency at the register.

The plaintiff children (all from families who receive public assistance), suing through their mothers and next friends, are in (and undertake to represent) various classes of needy students excluded from the school lunch program or deprived of its benefits because of allegedly unlawful practices. The largest class is that of children attending schools other than the four to which the program has been confined. A second class is those who attend one of the four schools where a lunch program is operative and whose families (though dependent upon public assistance) are above the gross income levels for eligibility but allegedly cannot afford to pay for lunches because of the high cost of other necessities. A third complains of the ticket procedure, alleging that the resultant humiliation has caused otherwise eligible children in the four participating schools to forego available free lunches.

Seeking declaratory and injunctive relief, plaintiffs assert rights under 42 U. S.C. § 1983 as well as the National School Lunch Act, regulations thereunder, and related legislation. They invoke the court's jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1343(3). They seek to maintain the suit as a class action under Fed.R.Civ.P. 23(b)(2). Plaintiffs have moved upon a broad stipulation and uncontroverted affidavits for summary judgment. There are no material issues of fact.[14] Accordingly, the court proceeds now to the further findings and conclusions that compel judgment for the plaintiffs.

■ 1. The court's jurisdiction is not seriously contested. It plainly exists, at any rate, under 28 U.S.C. § 1343(3), so there is no need to explore the alternative bases plaintiffs assert. E. g., Davis v. Robinson, 346 F.Supp. 847 (D.R.I., 1972); Christian v. New York State Department of Labor, Division of Employment, et al. 347 F.Supp. 1158 (S.D.N.Y. 1972); Ayala v. District 60 School Board, 327 F.Supp. 980 (D.Col.1971); Stogner v. Page, Civ.No. 69–1338 (N.D.Ill.February 5, 1970).

■ 2. The question of class treatment is manageable with comparable brevity. Again, there is no genuine dispute, and the correctness of plaintiffs' position seems clear. This is a case eminently appropriate for handling as a class action within Fed.R.Civ.P. 23(b)(2). The court so determines in accordance with subsection (c)(1) of that Rule.

■ 3. We approach the more interesting and difficult problems. Foremost is the contention that limiting the lunch

---

11. 42 U.S.C. § 1753 (Supp. I 1972); 7 C.F.R. § 210.11(b) (1972).

12. 7 U.S.C. § 612c (Supp. I 1972); 7 U. S.C. § 1431 (1970); 42 U.S.C. § 1755 (1970); 42 U.S.C. § 1758 (Supp. I 1972).

13. 42 U.S.C. § 1758 (1970). See also 7 C.F.R. § 245.8 (1972).

14. The papers in opposition said, without specification, that there were factual issues to be tried. Upon oral argument, however, the assertion was withdrawn and it was agreed that the case is a proper one for decision on the pending motion.

program to four schools, selected on the basis of physical facilities rather than concentration of poor children, violates the National School Lunch Act, federal administrative regulations issued pursuant to the Act, and the Equal Protection Clause of the Fourteenth Amendment. The court rules for plaintiffs under the statute and regulations. There is no need in this view to reach the constitutional problem.

Plaintiffs' thesis is not a novelty. It was advanced in a number of cases brought before the 1970 amendments to the National School Lunch Act. It had a mixed, mostly negative, reception. The best known decision was that of Briggs v. Kerrigan, 307 F.Supp. 295 (D.Mass.1969), aff'd per curiam, 431 F. 2d 967 (1st Cir. 1970), which rejected both the statutory and the constitutional arguments. While the Briggs decision was perhaps debatable in its setting, we may accept it without cavil for present purposes. Proceeding upon that basis, we are led to rule now for the plaintiffs because of significant 1970 amendments to the School Lunch Act and attendant changes in the administrative regulations.

The problem in Briggs reflected a complex of dissatisfactions among potential beneficiaries of the school lunch program and their spokesmen. The specific complaint in that case, like the one here —that lunch programs were confined to schools within the unit where physical facilities were "adequate," and thus, commonly, to the more rather than less affluent communities[15]—was heard from many quarters. Similarly, there were grievances against other manifestations of local frugality—in setting eligibility standards, in seeking major support from prices charged for paid lunches, and in otherwise preferring less strained budgets to better nourished children.[16]

The grievances touched tender nerves. Two distinguished scholar-scientists, submitting unquestioned affidavits for the plaintiffs before us, make vivid what we all know when they report that the miseries of hunger lead to listlessness, irritability, other emotional ills, and a generally diminished ability to profit from either education or the world's other opportunities. As might have been expected, the Congress was not indifferent to such concerns. The dissatisfactions led in 1970 to substantial amendments of the School Lunch Act directly pertinent to the instant case.

Senator McGovern, a principal proponent of these amendments, observed that the phrase every child "shall be served meals"

"is perhaps the most important phrase in all the legislation dealing with child nutrition. It creates, * * * 'a right to a school lunch.' This is a right bestowed on the children of America * * *.

"Without this vital language, and the right it creates, all our efforts at reform would be meaningless and empty. Our children would have only a promise, a hope rather than a right." 116 Cong.Rec. 13606 (91st Cong., 2d Sess., 1970).[17]

---

15. See Briggs v. Kerrigan, 307 F.Supp. 295, 299 (D.Mass.1969), aff'd, 431 F.2d 967, 968 (1st Cir. 1970) (per curiam); Ayala v. District 60 School Board, 327 F.Supp. 980, 982 (D.Col.1971). See also cases cited in Note, The National School Lunch Program, 1970: Mandate to Feed the Children, 60 Geo.L.J. 711, 712 n. 5 (1972).

16. E. g., Shaw v. Governing Board of Modesto City School District, 310 F. Supp. 1282 (E.D.Cal.1970). See complaints, hearings, and studies cited in Note, The National School Lunch Pro-

gram, 1970: Mandate to Feed the Children, 60 Geo.L.J. 711, 712 nn. 5 and 6 (1972).

17. On reviewing the implementation of these 1970 amendments, Senator McGovern later reflected:
"The Congress of the United States, years ago, really committed itself to the pledge that every needy child in this country should receive a free or reduced price meal, and to make sure that there was no mistaking the intent of Congress, as you know, we reaffirmed that pledge in even stronger

**1258**

The Conference Report on the amendments said:

"The conference amendment to the eligibility standard for free and reduced-price lunches makes it clear that every child from a household with an income below the poverty level shall be served free or reduced-price meals * * *.

"While it is the intent of the managers that every child from an impoverished family shall be served meals either free or at reduced costs—not to exceed 20 cents per meal—it is also the intent that free lunches be provided for the poorest of the poor and under no circumstances shall those unable to pay be charged for their lunches." Statement of the Managers on the Part of the House, Conference Report, H.R.Rep.No.91–1032, 91st Cong. 2d Sess. 9 (1970), U.S.Code Cong. and Admin.News, p. 3022.

In endorsing the Conference Report, Senator Javits, a member of the Select Committee on Nutrition and Human Needs, commented:

"Under this [income-eligibility] standard, set in the conference report, States and local schools will no longer be able to be arbitrarary [sic] in the determination of which children will receive free or reduced price meals as was the case in the past. The law will be clear: any child at poverty level must receive a free or reduced price lunch and priority for free lunches must be given to neediest children. This makes the intent of the Congress crystal clear that poor children can no longer be denied free or reduced cost lunches." 116 Cong.Rec. 13607 (91st Cong.2d Sess. 1970).

language a year ago [in the 1970 amendments].

"We made some definite effort to put in the words 'shall receive' so that there was no mistaking the intent of the Congress, that we wanted every needy child in this country that was in school to be offered a free or reduced price meal, and we said they should be fed.

Senator Dole, a member of both the Select Committee on Nutrition and Human Needs and the Agriculture and Forestry Committee, said:

"When passed, the National School Lunch Act and the Child Nutrition Act amendments will assure proper, adequate, and nutritious meals for all students, especially the children from lower income and poverty families. This will eliminate a hindrance these children have faced. It will aid them in assimilating the education so important to success in their mature lives." 116 Cong.Rec. 13608 (91st Cong., 2d Sess., 1970).

And President Nixon, signing the 1970 amendments into law, declared:

"The effect of this legislation is to assure that every child from a family whose income falls below the poverty line will receive a free or reduced-price lunch." 116 Cong.Rec. S10541 (daily ed. July 1, 1970).

In connection with a later amendment, also applicable here and further implementing the same basic goals,[18] Representative Broyhill, of Virginia, said:

"We need not debate here whether or not Congress is responsible for seeing that no child suffers from malnutrition in this Nation. We acknowledged that responsibility last year when we required by law that all schools participating in the national lunch program must provide free and reduced price meals for every needy child. * * *

"Regardless of the number of eligible children, the States and local school districts are now under congressional mandate to feed them and

"It is a very clear instruction." Hearings on Review of the National School Lunch Act Before the Senate Select Committee on Nutrition and Human Needs, 91st Cong., 2d Sess., pt. 8, at 2188 (1970).

18. 42 U.S.C. § 1764 (Supp. I 1972).

we must move now to reimburse them for the added financial burden we have placed on them by doing so." 117 Cong.Rec. H 3959 (daily ed., May 17, 1971).

To effectuate the fundamental objectives their proponents had repeatedly stated, the 1970 amendments made changes which would probably be clear enough by themselves, but the effect of which was made unmistakable by the harmonious regulations soon announced by the Department of Agriculture. Section 9 of the Act, 42 U.S.C. § 1758 (1970), was amended to provide:

"Lunches served by schools participating in the school-lunch program under this chapter shall meet minimum nutritional requirements. * * * *Such meals shall be served without cost or at a reduced cost not exceeding 20 cents per meal to children who are determined by local school authorities to be unable to pay the full cost of the lunch.* Such determinations shall be made by local school authorities in accordance with a publicly announced policy and plan applied equitably on the basis of criteria which, as a minimum, shall include the level of family income, including welfare grants, the number in the family unit, and the number of children in the family unit attending school or service institutions; *but, by January 1, 1971, any child who is a member of a household which has an annual income not above the applicable family size income level set forth in the income poverty guidelines shall be served meals free or at reduced cost.* The income poverty guidelines to be used for any fiscal year shall be those prescribed by the Secretary as of July 1 of such year. *In providing meals free or at reduced cost to needy children, first priority shall be given to providing free meals to the neediest children.*" (Emphasis added.)

The revision declared unambiguously the prime objective: that "any child" meeting the eligibility test should have a free or inexpensive lunch. At the same time, it outlawed arbitrary eligibility standards that had been utilized by individual districts or schools, often with an eye to finances rather than children's needs, by mandating minimum need criteria to be employed in a systematic plan for determining inability to pay. In addition, by setting a ceiling of 20 cents on reduced-price lunches, Congress eliminated the often-abused discretion of local school authorities.

The amendments provided that state and local efforts would be under continual federal scrutiny to further the aim of feeding lunch to every needy child as promptly as possible. The amended Section 11 of the Act, 42 U.S.C. § 1759a, now calls upon each State, under subsection (h)(1), to submit by the first of each year to the Secretary of Agriculture,

"* * * for approval by him as a prerequisite to receipt of Federal funds or any commodities donated by the Secretary for use in programs under this chapter and the Child Nutrition Act of 1966, a State plan of child nutrition operations for the following fiscal year, which shall include, as a minimum, a description of the manner in which the State educational agency proposes (A) to use the funds provided under this chapter and funds from sources within the State to furnish a free or reduced-price lunch to every needy child in accordance with the provisions of section 1758 of this title; (B) to extend the school-lunch program under this chapter to every school within the State * * *."

Also for the first time, state agencies and participating schools must now provide monthly data on the lunch programs. 42 U.S.C. § 1759a(h)(2), (3) (1970).[19]

---

19. Buttressing this increased state involvement, amended section 1756 now demands that a certain percentage of state matching funds must be revenues other than those derived from the program itself; States must now provide direct cash for

Further implementing the purpose to feed hungry children rather than serve local fiscal or administrative preferences, the amendments furnished funds "necessary to provide special assistance to assure access to the school lunch program * * * *by children of low-income families" (emphasis added), altering the former provision for such assistance solely to *needy schools*. See 42 U.S.C. § 1759a (1970).

Finally, 1971 legislation added vital financing for all aspects of school lunch programs. The Secretary of Agriculture was authorized to use, during the fiscal years 1971 and 1972, up to $135,000,000 to "carry out the provisions of [the National Lunch Program] relating to the service of free and reduced-price meals to needy children in schools and service institutions." 42 U.S.C. § 1764(a) (Supp. I 1972). Then, in a joint resolution

"[t]o assure that every needy schoolchild will receive a free or reduced price lunch as required by section 9 of the National School Lunch Act,"

Congress again authorized the Secretary of Agriculture to

"use so much of the funds appropriated by section 32 of the Act of August 24, 1935 (7 U.S.C. 612c), as may be necessary, in addition to the funds now available therefor, to carry out

program support rather than rely on children's lunch payments for the bulk of their share. 42 U.S.C. § 1756 (1970).

20. There are intimations that Department of Agriculture officials have not read their agency's regulations to mean what they appear plainly to say. See Note, The National School Lunch Program, 1970: Mandate To Feed the Children, 60 Geo.L.J. 711, 729–36 (1972). But these officials are not less bound than the rest of us to obey their own formal and authoritative rules. E. g., Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1959); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); United States ex rel. Donham v. Resor, 436 F.2d 751, 754 (2d Cir. 1971).

21. 7 C.F.R. § 210.2(p) (1972).

the purposes of section 11 of the National School Lunch Act and provide a rate of reimbursement which will assure every needy child of free or reduced price lunches during the fiscal year ending June 30, 1972 * * * *." H.R.J.Res. 923, 85 Stat. 419 (1971).

■ Guided by both the legislative text and history, the Department of Agriculture announced weightily contemporaneous regulations. The validity of these has not been questioned. Their meaning is disputed. But they appear in this court's view to lend the force of law, thus governing officials and the people alike, to plaintiffs' position here.[20]

The new regulations, in a conception important here for understanding their scope and impact, define a "school food authority" as "the governing body which is responsible for the administration of one or more schools and which has the legal authority to operate a lunch program therein * * * *."[21] In the instant case, as in most, the "school food authority" is the Board governing the school district.

The regulations go on to reiterate and implement the objective that lunches are to be supplied "to all children" found to be needy under publicly announced criteria which "shall be applicable to all schools under the jurisdiction of the school food authority * * * ."[22] It

22. 7 C.F.R. § 245.3(a) (1972):
"Each school food authority shall serve lunches free or at a reduced price to all children whom it determines, in accordance with the requirements of this part, are unable to pay the full price of the lunch. The criteria used by the school food authority in making such determinations shall be included in standards of eligibility which shall be approved by the State agency, or FNSRO [Food and Nutrition Service regional office] where applicable, as part of the policy statement required under § 245.10, and shall be publicly announced in accordance with the provisions of § 245.5. Such standards shall specify the specific criteria to be used, respectively, for free lunches and for reduced price lunches; they shall be applicable to all schools under the ju-

is made explicit that "all children from a family meeting the eligibility standards and attending any school under the jurisdiction of the school food authority shall be provided the same benefits."[23] The point of setting the criteria to reach "any child" in an eligible family is underscored by repetition in varying contexts.[24] The practical problem of expansion over time is acknowledged, but there is a reminder that "first priority" must be given "to the neediest children" within the district's (or "school food authority's") jurisdiction.[25] The emphasis upon all children *within the district* rather than in single schools participating because they have facilities is carried forward in the provision for transfers from one school to another. Thus:

"If a child transfers from one school to another school under the jurisdiction of the same school-food authority, his eligibility for a free or reduced-price lunch, if previously established, shall be transferred to, and *honored by,* the receiving school."[26]

In sum, the regulations served to make unequivocal the humane and compelling statutory mandate. Reflecting satisfaction on this score, on September 22, 1970, following the issuance of the final regulations, Senator McGovern said:

"[7 C.F.R. § 245.3] clearly is consistent with the intent of Congress to extend the program benefits to every needy child and the program itself to every school. And the regulations now clearly emphasize that when one school in a school district serves lunch, then all other schools in that district must provide equal treatment in nutritional services for all needy children * * *.

"[A]ll is clear now. Every needy child shall be served a free or reduced-price lunch. That is the law." 116 Cong.Rec. 33000–01 (91st Cong., 2d Sess. 1970).

The court concludes that the foregoing quotation embodies the law as laid down by statute and controlling regulations.

 While this is determined as a nonconstitutional matter, it is fitting to recognize that constitutional rumblings are in the near background. Mount Vernon's arrangements might get by if the test of equal protection were the only issue. They *might*—as happened in Briggs v. Kerrigan, *supra*,—but it is fair to say that the question would be one of substance. Glaring inequalities in the dispensation of elemental necessities within a single city—indeed, within single families—surely trigger arresting thoughts about the limits of permissible discriminations. The explanation—about available "facilities" and budgetary strains—might turn out to seem rational enough, but it is scarcely compelling.[27] It is at best depressing to know that everyone's desire to nourish children may

---

risdiction of the school food authority; and they shall provide that all children from a family meeting the eligibility standards and attending any school under the jurisdiction of the school food authority shall be provided the same benefits."

23. *Id.*

24. See 7 C.F.R. § 245.3(b) (1972).

25. 7 C.F.R. § 245.4 (1972).

26. 7 C.F.R. § 245.6(b) (1972) (emphasis added).

27. "Citizens may not be compelled to forgo their constitutional rights because officials * * * desire to save money." Palmer v. Thompson, 403 U.S. 217, 226, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438 (1971). That pithy observation reflects, among more important things, that the marginal analysis, whether dismal or not, is for people other than judges and for contexts other than constitutional law. It is not a court's business to choose, as a matter of taste or political advantage, among school football teams, dance bands, and lunches for hungry children. It seems enough here, as we have said, that Congress has chosen. Thus, speaking to the 1970 amendments discussed above, Senator Mondale said:

"I recall hearing testimony during the hearings to the effect that children who come to school without having had enough to eat cannot learn.

"If we had to make a choice between textbooks and nutrition, it would be wiser to forgo the textbooks and feed the children so that they would be

founder upon such obstacles—in a country that has known how to feed adults in murderous pursuits on unpacific atolls, in jungles, on deserts, at sea, and in space. Without reaching them for decision, we may recognize that plaintiffs' constitutional claims are neither frivolous nor immaterial on the subject of statutory interpretation. We are taught to construe when possible to skirt constitutional doubts. It may be still more cogent in the present setting to recall that legislators not less than judges are under the Constitution, that glaring inequalities under the law are among the most familiar targets of legislative action, and that this sort of fundamental concern was prominent among the factors underlying the amendatory legislation before us. It may be said in a word that considerations essentially constitutional in character support, if they do not flatly compel, the result reached by the court today.

■ Finally, though by no means least weightily, recent and persuasive precedent points in the same direction. On August 2, 1972, Chief Judge Pettine, in Davis v. Robinson, 346 F.Supp. 847 (D.R.I. 1972), held that the failure of a participating school district to establish lunch programs in the neediest schools first, and to provide free lunches first to the neediest children within the district, violates the National School Lunch Act and the regulations—a ruling followed squarely in the next point of this decision. It is notable that in the course of reaching that apposite, but not identical, result, Judge Pettine also pointed out that, as this court now holds, school districts, once they elect to participate at all, "must provide * * * lunches to all schools within the district which contain children whose families meet the in-

come poverty guidelines, whether or not those schools have previously participated in the program." *Id.* at 856 n. 5.

Still more squarely in point is Jones v. Board of Education 348 F.Supp. 1269 (N.D.Ohio 1972), holding that the 1970 amendments overruled Briggs v. Kerrigan, *supra,* and now forbid participation by some but not all schools within a district. To the same effect, see the thoughtful student note, The National School Lunch Program, 1970: Mandate to Feed the Children, 60 Geo.L.J. 711 (1972). And compare the decision, under the Act as it stood before the 1970 amendments, in Shaw v. Governing Board of Modesto City School District, 310 F.Supp. 1282 (E.D.Cal.1970).

■ 4. There is an additional, somewhat narrower ground for invalidating the course defendants have chosen to follow. For reasons amply explained by Chief Judge Pettine, in Davis v. Robinson, *supra,* the 1970 amendments must be held to require, as they literally command, that "first priority * * * be given to providing free meals to the neediest children." 42 U.S.C. § 1758 (1970). Far from obeying this mandate, defendants supply lunches where they have "facilities." The "facilities" tend to be where the least needy students go to school; at least they are absent from the neediest areas. Cf. Davis v. Robinson, *supra,* at 852; Ayala v. District 60 School Board, *supra* at 982; Briggs v. Kerrigan, *supra,* 307 F.Supp. at 301. See also Note, The National School Lunch Program, 1970: Mandate to Feed the Children, 60 Geo.L.J. 711, 718 (1972). Apart from that, the commands of the statute, like those of the Constitution, are concerned with people, not facilities.

capable of learning." 116 Cong.Rec. 4409 (February 23, 1970).
With that kind of legislative choice already made, the demands of equal protection are not readily dismissable on budgetary grounds. And there appears to be no case—whether the subject was supplying appeal records to indigents, Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), giving welfare

benefits to non-residents, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), or delaying the desegregation of public parks, Watson v. Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963), where the expense of uniform treatment for people similarly situated has been deemed to justify anything less.

It may be permissible to observe that defendants' position seems appalling as a matter of policy. With modern technology embracing TV dinners and tubed meals in space, there is a want of inspiration in the insistent surrender to gaps in architecture or utensils. It is not claimed that the plaintiffs are entitled even to hot meals, at least not immediately. And the court, without culinary expertise, may notice what everyone knows—that nutritious lunches may be packaged and delivered by a variety of means requiring no special equipment at the places of consumption. This is enough to satisfy anyone that defendants' criteria of selection, totally unsatisfactory in human terms, are not justifiable as supposed physical necessities. It is, therefore, realistic and feasible to order that these criteria be replaced by the ones Congress ordained.

■■■■■ 5. Pursuant to the mandate of 42 U.S.C. § 1758, that lunches be provided to all those unable to pay the full cost, the Department of Agriculture promulgated 7 C.F.R. § 245.3(b):

> "Each school food authority shall by express provision permit any family which does not meet the eligibility criteria established by the school food authority to apply for a free or reduced price lunch for its children, stating the reasons why, even though it does not meet such eligibility criteria, such family believes that its children are unable to pay the full price of the lunch. If the school food authority determines, on the basis of such application * * * that the children of such family are unable to pay the full price of the lunch, a free or reduced price lunch shall be made available to such children." [28]

Defendants concede their failure to inform parents that families above the stated income-eligibility levels may have free or reduced-cost meals for their children if they cannot afford to pay for them. They argue, however, that they lack the financial wherewithal to provide free lunches to all the needy children falling within the income-eligibility levels, and therefore cannot be expected to provide lunches to others, even in a school already serving lunches. The failure is indefensible for reasons already outlined. The rights given by paramount federal law are not to be nullified because it costs money to honor them. This wrong must be remedied.

■■ 6. Finally, defendants defend their system of tickets, used almost exclusively by needy children, as all they can think of to avoid the identification and stigmatization forbidden by the federal statute and regulations. Among the regrettable incidents of this defense is the observation that some children who *pay* for their lunches—some 1.1% to be specific—also use the tickets. Elsewhere in the papers we see another reference to these paying ticket holders— the reported observation of a state official, generally in sympathy with defendants, that such children "were accused [*sic*] by other children as being [*sic*] free lunch recipients." [29]

Whoever is or is not "accused," an American court in 1972 is compelled to be aware of invidious badges and their effects upon people, not least young people. The fact that some may "choose" to purchase tickets ought to be too patently trivial to mention. That some may prefer the back of the bus or the balcony has not seemed relevant for at least the last generation or so. It is sufficient for our purposes that whether poverty is an inconvenience or a disgrace, many youngsters are ashamed to have it seen, and federal lawmakers and administrators have decreed respect for their feelings. If local ingenuity is incapable of formulating means of compliance, we have in the record before us an array of

---

28. See also 7 C.F.R. § 245.6(d) (1972).

29. Letter of Richard O. Reed, Bureau Chief, Division of Educational Finance, N.Y. State Education Department, to Herbert Rorex, Director, Child Nutrition Division, Food and Nutrition Service, U.S. Department of Agriculture, January 24, 1972.

evidently workable possibilities. The court will order prompt adoption of one of these or some agreeable variant.

7. The point last mentioned and the one preceding it present no complexities of enforcement. This is not equally true of the major determination—that defendants must proceed, reaching the neediest first, to extend the lunch program through the schools of Mount Vernon. Counsel for plaintiffs acknowledged at oral argument that this would call for some careful work, and expressed a commendable willingness to collaborate. Counsel for defendants tendered only the dolorous assurance that it will be "impossible" to extend the lunch program to the thus far excluded majority of Mount Vernon's needy children. The prediction lacks even an iota of documentation. It is legally, morally, and practically unacceptable. The court is not permitted to be deflected by such barren submissions. We are permitted, and compelled, to proceed with fairness, understanding, patience, and flexibility in fashioning and enforcing equitable decrees. That will be done. But it will be done in a sure determination to see that the law is enforced. Law and order must start, after all, at the comfortable level of officialdom if it is to reach the deprived and the excluded.

■ Accordingly, without doubting or minimizing the difficulties, we are all under a duty, in this court's view, to see that the extension of Mount Vernon's lunch program to all its needy children begins promptly and goes forward speedily.[30] The era of "deliberateness" in such matters seems to have passed. Defendants have, in any event, been deliberate for a long time already; the record shows that plaintiffs and others have for over a year sought in vain to negotiate remedies for the problems before us.

Upon these premises, the court will order a hearing within the coming week on the terms of an appropriate decree or decrees.[31]

30. The court was given to understand at oral argument that defendants might feel "compelled" by budgetary considerations to end the lunch program altogether if the present arrangements were enjoined. This is evidently thought to be an available option on the principle that school districts, though they must function lawfully and without undue discriminaton if they run a lunch program, cf. Brown v. Board of Education, 347 U.S. 483, 493 (1954) ; Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956), are free to have no program at all. Cf. Shaw v. Governing Board of Modesto City School District, 310 F.Supp. 1282 (E.D.Cal.1970). It is by no means clear, however, that the cruel alternative of total abandonment is actually available. Apart from the fact that defendants' decision to go that route would be "reason for everyone to be disheartened," it also could mean that the court "must search out the fact and truth of [the new arrangment] to determine if the Constitution has been violated." Evans v. Abney, 396 U.S. 435, 443–444, 90 S.Ct. 628, 633, 24 L.Ed.2d 634 (1970). It may be accepted that defendants' forecast of termination is not intended as a threat. It is nevertheless perfectly clear that the effect is an incipient threat of a substantial sort. We may question whether in this setting the Board is free to cut off all lunches as the end result of this lawsuit, or whether a consequence so chilling for litigants pressing concerns so primitive as hunger would not offend paramount federal interests. Cf. Palmer v. Thompson, 403 U.S. 217, 269–270, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1970) (White, J., dissenting). The suggested prospect is in a murky area of state "withdrawals" where there is at least a "necessity for a court to assess the potential impact of official action," Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830 (1967), upon rights possibly affected by superficially "negative" measures. It is sufficient for now to voice the hope that there may be no occasion to explore such problems with respect to the future course of Mount Vernon's lunch program.

31. It may be that partial or temporary decrees should be issued to dispose of the simpler problems—specifically, (a) the forms of notice and application to apprise families of eligibility despite "excessive" gross income, and (b) the alteration of existing ticket arrangements. Counsel are invited to submit proposals along these lines as promptly as may be feasible.